896 F.Supp. 1050 (1995)
MITEL, INC., a Delaware corporation, Plaintiff,
v.
IQTEL, INC., a Colorado corporation, Defendant.
Civ. A. No. 95-B-900.
United States District Court, D. Colorado.
August 23, 1995.
*1051 Carole K. Jeffrey, Davis, Graham & Stubbs, Denver, CO, Robert B. Breisblatt, Eric C. Cohen, Welsh & Katz, Ltd., Chicago, IL, for plaintiff.
Dennis A. Graham, Robert R. Marshall, Jr., Harold R. Bruno, III, Hopper and Kanouff, Denver, CO, for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER
BABCOCK, District Judge.
Plaintiff Mitel, Inc. (Mitel) seeks a preliminary injunction prohibiting Iqtel Inc. (Iqtel) from using the Mitel translation mode in its call controllers. Mitel claims that Iqtel has copied from Mitel's manuals Mitel's instruction sets which are used to program its call *1052 controllers. A hearing was held for two and a half days beginning August 8, 1995. I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Having heard the testimony of the witnesses, having reviewed the exhibits admitted into evidence, and having considered the parties' contentions, I enter the following findings of fact and conclusions of law.

I. FINDINGS OF FACT
Mitel is Delaware corporation with its principal place of business in Herndon, Virginia. Mitel manufacturers and sells a telephone call controller under the trademark SMART-1. Mitel has produced call controllers since 1985.
Iqtel is a Colorado corporation with its principal place of business in Fort Collins, Colorado. Iqtel manufactures, through its subcontractor Assembly Technologies, and sells a telephone call controller under the trademark IQ200+ Call Management System (IQ200+). The IQ200+ was first produced commercially in 1994.
A call controller is an add-on to a telephone service which permits the end user to receive equal access to long distance service. The call controller allows the end-user to dial the number one and access its long-distance carrier without having to dial a cumbersome code. The call is then routed through the central telephone service company which routes the call to the long-distance carrier chosen by the end-user. The call controller is also capable of providing numerous functions which enhance the function of the telephone. Some of these functions include speed dialing, tone-to-pulse conversion, automatic redial and call detail recording. The call controller is purchased by a long-distance carrier and installed by technicians employed by the long-distance carrier.
Each of the functions provided by the call controller must be programmed into the call controller. Technicians program the call controller using a series of commands entered through a telephone keypad or a lap-top computer connected to the phone line. These codes are three and four digit numbers or letters that specify the particular function of the call controller. In the Mitel manual the first three digits are called the register. The first number in the register references the line accessed. The next two digits access the particular function. The last number in the code, called the description, represents a value attached to the particular function. For example, the function time between trunk release and next attempt to connect can be programmed for 500 milliseconds (ms) up to 1850 ms at 150 ms intervals depending on the end-user's needs. Each of these intervals is assigned a number between 0 and 9 which can be programmed into the call controller as the description. Each function has a separate registration code and description which together Mitel calls an "instruction set."
The Iqtel call controller is programmed in the same manner as the SMART-1 call controller. Like the Mitel call controller, Iqtel uses a four digit code. However, the first two digits in the Iqtel code access the function and the third digit accesses the line. As with the SMART-1, the fourth digit represents a value attached to the function. Iqtel calls the first three digits a reference code and the fourth digit a value. In addition to its own programming code, the Iqtel call controller contains a Mitel translator which permits the technician to enter Mitel codes into the Iqtel call controller to access the Iqtel functions. Whether using the Iqtel mode or the Mitel translator, Iqtel's values are identical to Mitel's descriptions. I will refer to these four digit codes as "command codes."
Because the call controller can be programmed via a lap-top computer, many of the long distance carriers have software application programs which put the Mitel command codes into a macro which can be entered directly into the call controller. These macros contain the individual carrier's specifications for each function which are downloaded at the same time and significantly reduces installation time.
Mitel's command codes are contained in its SMART-1 General Programming Guide (the manual). The manual was first copyrighted in 1985. Mitel also distributed abbreviated versions of the manual and pocket reference *1053 cards containing the codes which were not copyrighted. They did, however, refer to the copyrighted manual.
In his testimony, Mr. Zabel, a software engineer for Mitel, agreed that Mitel's command codes are designed to be user friendly. The call controller is not activated until the technician enters the command codes. The command codes remain in the computer's memory to instruct the program what to do when activated. Mr. Champagne, the software engineer who assisted Mr. Burne in designing the Smart-1 software, testified that the command codes "set-up" the call controller. The registers and descriptions, however, "are not in the software." He also testified that the values attached to a particular function represent in part the relationship between the central office and the call controller. Focusing on the function "flash time allowed," he stated that he did not know why the values were chosen, but that other values could have been chosen.
Don Jorgenson, the designer of the IQ200+, originally began developing a call controller in 1985. He gave up on the idea based on what he saw was a diminishing market. In 1989 and 1990, Jorgenson developed a device which protected telephone lines from power surges usually caused by lightening. Rather than sell the surge protector to another company for use in its call controller, Jorgenson decided to resurrect the call controller he had designed in 1985. After studying the market, Jorgenson determined that for his call controller to be competitive it must be compatible with the Mitel call controller because Mitel then controlled between 75% and 90% of the call controller market. Technicians who installed and programmed call controllers were accustomed to Mitel's command codes and expressed a reluctance to learn new codes. Industry feed-back convinced him that long distance carriers were not willing to invest in retraining their technicians, redeveloping the application programs, or modifying their billing systems to accommodate a new product.
Jorgenson testified that he copied the registers and descriptions from the 1991 manual in the development of the Mitel translator. He also acknowledged that where the functions were the same, he copied the Mitel descriptions for each function. Jorgenson stated that he used these values because the values employed by Mitel represented a low to high range for the optimum performance of the function. In addition, because the call controller communicates between the enduser and the telephone company, the values are often dictated by the central office. Jorgenson did admit, however, that he could have chosen other values but that such a choice would not have been a good engineering choice.

CONCLUSIONS OF LAW
Mitel seeks a preliminary injunction pursuant to 17 U.S.C. § 502(a) to prohibit Iqtel from infringing its copyright in the command codes used to program the SMART-1. Critically, Mitel does not claim that the instruction sets are part of the software program that runs the SMART-1. Mitel describes the set-up process as:
Entering the "Registers" and "T" values into the call controller causes a computer program in the call controller to perform certain functions. It is the computer program, in conjunction with the hardware in the call controller that performs the functions. The "Registers" and "T" values by themselves perform no function.
Plaintiffs Proposed Findings of Fact and Conclusions of Law, ¶ 9. Mitel does not claim that the command codes are source codes or object codes. The parties do not dispute that a variety of combinations or sequences could have been used to create the command codes or that other values could have been chosen for each of the functions. Iqtel contends, however, that the command codes are a method of operation which is not copyrightable. If the command codes are copyrightable, Iqtel contends that the scenes a faire doctrine applies or that its use of the command codes is a "fair use" under the Act.

Preliminary Injunction
The Tenth Circuit set forth the conditions for preliminary injunctive relief in SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096 (10th Cir.1991). A plaintiff must show:

*1054 (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.
Id. at 1098.

Substantial Likelihood of Success on the Merits.
In order to prevail on its claim of copyright infringement, Mitel must show: (1) ownership of a valid copyright, and (2) copying by Iqtel of protected components of the copyrighted material. Gates Rubber Co. v. Bando Chemical Industries, Ltd., 9 F.3d 823, 831 (10th Cir.1993). The central question here is whether the Mitel command codes are "protected components" of its copyrighted material. I conclude that they are not.
"A Certificate of Registration, if timely obtained, constitutes prima facie evidence of the validity of the copyright. 17 U.S.C. § 401(c); Autoskill, 994 F.2d at 1487. Once the presumption pursuant to 17 U.S.C. § 401(c) is established, the defendant has the burden of overcoming it." Id. at 831-832. Mitel received a Certificate of Registration for the manual containing the command codes on March 24, 1995. The manual contained a notice of copyright from the date of publication in 1985. Mitel also produced several abbreviated forms of the manual in 1988 and 1989 that were not copyrighted but were included in the product package with the SMART-1 and referred to the copyrighted manual. In addition, as early as 1986 Mitel supplied purchasers of the SMART-1 with pocket reference cards which were used as "cheat sheets" for the technicians who installed the call controllers. These reference cards and abbreviated manuals which contained the command codes were not copyrighted but referenced the copyrighted manual.
Iqtel argues that Mitel is not entitled to claim copyright protection for the command codes because they were included in materials which have been in circulation for more than five years and did not bear a copyright notice. Pursuant to § 405 of the Act, an author of a work must place a notice of copyright on his work within five years of publication in order to claim a copyright. 17 U.S.C. § 405. Mitel contends, however, that the failure to provide notice of copyright on the supplemental materials is not fatal under the unit publication doctrine. I agree.
The unit publication doctrine provides that copyright notice affixed to one element of a publication containing various elements gives copyright protection to all elements of the publication. Koontz v. Jaffarian, 787 F.2d 906 (4th Cir.1986). Here, the manual clearly contained a copyright notice. The abbreviated manuals and reference cards were simplified versions of the manual. These supplemental materials referenced the copyrighted materials. Thus, the supplemental material were part of several elements consisting of one publication. As such, I conclude that Mitel has a valid copyright in the manual.
"Once the plaintiff has shown that it holds a valid copyright, it must next prove that the defendant unlawfully appropriate protected portions of the copyrighted work." Id. at 832. To meet its burden, Mitel must prove that Iqtel copied its command codes and that the command codes are a protected expression which is of such importance to the copied work that the appropriation is actionable. Id. at 832. There is no dispute that Iqtel copied the Mitel command codes.
The Copyright Act protects "original works of authorship fixed in a tangible medium of expression." 17 U.S.C. § 102. "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (emphasis added). Mitel claims that the command codes are protected under the copyright laws because they are creatively chosen sets of alpha numeric codes. Mitel conceded, however, at *1055 the hearing that its command codes are not a computer program.
Mitel argues that the abstraction-filtration-comparison test adopted by the Tenth Circuit in Autoskill, Inc. v. National Educational Support Systems, Inc., 994 F.2d 1476 (10th Cir.1993) and Gates Rubber, applies in this case. The abstraction-filtration-comparison test was adopted in Autoskill and Gates Rubber to determine the scope of copyright protection for computer programs. Here, however, Mitel concedes that its command codes are not a computer program. Moreover, the Tenth Circuit in Gates Rubber acknowledged that "the appropriate test to be applied and the order in which its various components are to be applied in any particular case may vary depending on the claims involved, the procedural posture of the suit, and the nature of the computer programs at issue." Gates Rubber, 9 F.3d at 834, n. 12.
The evidence established that the numbers constituting the command codes were arbitrarily chosen and arbitrarily assigned to each function. The evidence established that the command codes are a user interface by which a technician sets the call controller to activate its various functions. Once set, the call controller continuously performs the functions as entered until the call controller is reprogrammed. The command codes are analogous to the parts numbers in Toro Company v. R & R Products Co., 787 F.2d 1208 (8th Cir.1986).
In Toro Company, the plaintiff claimed a copyright to its replacement parts numbering system. Plaintiff alleged that defendant's use of a catalog which indexed various replacement parts by the original manufacturer's part number and name violated this copyright. Id. at 1210. The Eighth Circuit upheld the jury's determination that no infringement resulted from the defendant's use of the identical part number to sell replacement parts. The court recognized that the idea of parts numbering was not subject to a limited number of expressions. However, the court held that "the random and arbitrary use of numbers in the public domain does not evince enough originality to distinguish authorship." Id. at 1213.
Mitel's command codes serve the same function as the parts numbers in Toro Company. The parts numbers in Toro Company permitted the competing company to ensure product uniformity to the customer. The command codes here allow Iqtel to ensure functional uniformity to the customer. They are also compatible with the technical requirements of the long-distance carrier. The command codes are simply a procedure, process, system, and method of operation by which the customer can match the call controller functions to the long-distance carriers' technical needs and the end-user's choices. Without the command codes the function would not occur and the result would not be achieved. Consequently, I conclude and hold that the command codes are not protected components of Mitel's copyrighted material. 17 U.S.C. § 102(b); See Gates Rubber, 9 F.3d at p. 836, n. 13.
I arrive at the same conclusion applying the Gates Rubber abstraction-filtration-comparison test. I first abstract out the various parts of the computer program and then filter out those portions of the program which are not copyrightable. Gates Rubber, 9 F.3d at 834-836. If, arguably, the command codes are considered part of the computer program in the call controller then their sole purpose is to provide access to the functions available in the call controller. Thus, they provide the means to access or operate the program contained in the software.
The filtration process is designed to distinguish between ideas and expressions. The idea that a program has a process at its instigation which allows the user to access the program is not a new one, nor is it one at its conception that would be copyrightable. The command codes in this case simply act as a key to unlock the inner functions of the call controller. The fact that Mitel has made choices in selecting its numbers does not in and of itself mean that the command codes are "original" or that they are an expression.
Mitel cites Autoskill for the proposition that user interfaces are protected under copyright law. However, Autoskill is distinguishable. In Autoskill plaintiff claimed that the defendant had infringed its copyright *1056 through the development of a software program for teaching reading skills to students with reading disabilities. Part of the program included a keying process where the student responded to the audio-visual display by pressing the 1, 2, or 3 keys. Based on the responses to the visual display, the computer evaluated the individual's performance. Thus, the computer program required constant interaction between the end-user and the computer program. Moreover, the keying process was at the core of the software program. Furthermore, the court noted that the defendant presented no substantial evidence "that this procedure was such a common practice, or that it was dictated by efficiency considerations, so that it should have been filtered out of the analysis." Autoskill, 994 F.2d at 1495, n. 23.
In contrast, here it is the technician, a third party, who installs the call controller. He is an intermediary between the end-user and the long-distance carrier. He does not interact with the software program. He merely "sets up" the call controller so that the end-user can access the functions in the software program. To the contrary, in Autoskill the keying process was integral to the software program. In addition, proclivities of technicians largely dictate the need to conform the command codes in order to have market accessibility. The evidence proved that the Mitel command codes have become a common practice in the industry. Contrary to plaintiff in Autoskill, Iqtel established that it copied the command codes for reasons of efficiency. The doctrine of "scenes a faire" excludes from copyright protection "those elements that have been dictated by external factors." Gates Rubber, 9 F.3d at 838. "In the area of computer programs these external factors may include: hardware standards and mechanical specifications, Manufacturer's Technologies, Inc. v. Cams, Inc., 706 F.Supp. 984, 995 (D.Conn.1989), software standards and compatibility requirements, Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510, 1525-27 (9th Cir.1992), computer manufacturer design standards, target industry practices and demands, see Plains Cotton Co-op v. Goodpasture Computer Serv., 807 F.2d 1256, 1262 (5th Cir.1987), and computer industry programming practices, see Apple Computer, Inc. v. Microsoft Corp., 799 F.Supp. 1006, 1033 (N.D.Cal.1992)." Id. (emphasis supplied). I conclude that the Mitel command codes have become a common practice or industry standard in the call controller market. I further conclude that the telephone keypad and communications link between the long-distance carrier and the end-user impose certain parameters on the call controller market which justifies Iqtel's copying of Mitel's command codes. Thus, I conclude that these command codes are not copyrightable under the doctrine of "scenes a faire." Having concluded that the command codes are not copyrightable, I need not address the comparison prong of the Gates Rubber test.
Even assuming the command codes are copyrightable, Iqtel's use of these same command codes constitutes a "fair use" under the Act. Section 107 of the Act sets forth the factors for determining whether there is a "fair use" of otherwise copyrightable material. 17 U.S.C. § 107. They include:
1) the purpose and character of the use including whether such use is of a commercial nature or is for nonprofit educational purposes;
2) the nature of the copyrighted work;
3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
4) the effect of the use upon the potential market for or value of the copyrighted work.
These factors are not exclusive. Rather, the doctrine of fair use is in essence "an equitable rule of reason." Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985).
The Ninth Circuit in Sega Enterprises Ltd. v. Accolade, Inc., 977 F.2d 1510 (1992) (cited with approval in Gates Rubber), addressed the fair use doctrine in the context of user interfaces. There, Accolade, through reverse engineering, copied Sega's interface specifications for use with the Genesis console. The interface specifications permitted Accolade *1057 to make its game cartridges compatible with the Genesis console. The Ninth Circuit rejected Sega's contention that the use was unfair because Accolade copied its object code to produce a competing product. The court held that although "Accolade's ultimate purpose was the release of Genesis-compatible games for sale, its direct purpose in copying Sega's code and, thus its direct use of the copyrighted material, was simply to study the functional requirements for Genesis compatibility so that it could modify existing games and make them usable with the Genesis console." Id. at 1522. The court further held that the public benefitted from the increase in independently available games. Id. at 1523. "It is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." Id. at 1523.
Reviewing the factors set forth in § 107, it is uncontested that Iqtel copied the command codes for a commercial purpose. Iqtel copied the command codes to have access to the market and to compete with Mitel. The testimony revealed that Mitel controls between 75% and 90% of the call controller market. Mitel had controlled the market for approximately nine years before Iqtel introduced the IQ200+ system. The technicians who installed and programmed call controllers were accustomed to the Mitel codes and expressed an unwillingness to learn new programming codes. Furthermore, the long-distance carriers were reluctant to invest additional funds into retraining the technicians, developing new application programs, and modifying their billing systems to accommodate a new call controller system. Under these circumstances, in order to be competitive, Iqtel had a "legitimate non-exploitative purpose" for copying the command codes. Id. at 1523. Application of the fair use doctrine's equitable rule of reason leads me to conclude that Iqtel's use of the command codes is a fair use under the Copyright Act.
In summary, I first conclude that the command codes at issue are not protected components of Mitel's copyrighted material because they are a "procedure, process, system, [and] method of operation" under 17 U.S.C. § 102(b). Although unnecessary, application of the abstraction-filtration-comparison test yields the same conclusion buttressed by the additional applications of the scenes a faire and fair use doctrines. For the reasons set forth above, I therefore conclude that Mitel has not proven that it has a substantial likelihood of success on the merits and, thus, I need not address the remaining factors set forth in Visa USA, Inc.
Accordingly it is ORDERED that:
The motion for preliminary injunction is DENIED.