

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-24-2002

# GEAC Computer Sys v. Grace Consul Inc

Precedential or Non-Precedential: Precedential

Docket No. 00-2772

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"GEAC Computer Sys v. Grace Consul Inc" (2002). *2002 Decisions.* Paper 603.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/603

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2772 and 00-2932

DUN & BRADSTREET SOFTWARE SERVICES,
INC.; GEAC COMPUTER SYSTEMS, INC.

v.

GRACE CONSULTING, INC.; GRACE MAINTENANCE
INT.; ANTHONY ILUTZI

     GEAC ENTERPRISE SOLUTIONS, INC.
     f/k/a
     GEAC COMPUTER SYSTEMS, INC.,

Appellant No. 00-2772

DUN & BRADSTREET SOFTWARE SERVICES,
INC.; GEAC COMPUTER SYSTEMS

v.

GRACE CONSULTING, INC.; GRACE MAINTENANCE;
ANTHONY ILUTZI

Appellants No. 00-2932

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 94-cv-01090
District Judge: Honorable Katharine S. Hayden

Argued January 17, 2002

Before: SCIRICA, ROSENN, Circuit Judges,
and KANE,* District Judge

(Filed: September 24, 2002)

Wayne C. Matus (Argued)
LeBoeuf, Lamb, Greene & MacRae
125 West 55th Street
New York, NY 10019

Harvey C. Kaish
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ 07107-0652

Peter J. Gallagher

Salans, Hertzfeld, Heilbronn,
 Christy & Viener
620 Fifth Avenue
New York, NY 10020

  Counsel for Appellant
Geac Computer Systems

Andrew J. Kyreakakis (Argued)
Ambrosio, Kyreakakis, DiLorenzo,
 Moraff & McKenna
317 Belleville Avenue
Bloomfield, NJ 07003

  Counsel for Appellees
Grace Consulting, Inc. and Grace
Maintenance

Leonard T. Nuara (Argued)
Thacher, Proffitt & Wood
1 Exchange Place, Suite 600
Jersey City, NJ 07302

  Counsel for Appellee
Anthony Ilutzi

---

* Honorable Yvette Kane, United States District Court for the Middle
District of Pennsylvania, Sitting by Designation.

2

Ronald S. Katz
Coudert Brothers
600 Beach, 3rd Floor
San Francisco, CA 94109

  Counsel for Amicus for
Appellee Service Industry
Association

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents serious problems of alleged
copyright infringement in an evolving and highly
competitive world of computer technology that challenges
the effectiveness of our well-established copyright laws.
Formerly known as Dun & Bradstreet Software Services,
Inc. (DBS), Geac Computer Systems, Inc. (collectively Geac)
is the undisputed owner of certain proprietary, copyrighted
software, including a system known as Millennium. The
system is designed to provide valuable services to the
business community at large.

Millennium contains highly confidential information and
trade secrets that were designed and developed by Geac at
great effort and expense. Geac complains that Grace

Consulting, Inc., its founder, president, and chief executive officer Anthony Ilutzi, and a related enterprise, Grace Maintenance, Int. (collectively Grace) deliberately have infringed on Geac's copyrighted software while in the course of providing consulting and maintenance services to companies licensed by Geac to use its software.

Geac brought suit against Grace in March 1994 in the United States District Court for the District of New Jersey.1 Grace filed an answer together with counterclaims for

---

1. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. SS 1331, 1338 and 1367 because the plaintiffs' complaint alleges claims under the federal Copyright Act and related state law claims. This court has appellate jurisdiction of the timely appeals from the final judgment of the District Court pursuant to 28 U.S.C.S 1291.

breach of contract and tortious interference. The District Court struck Grace's counterclaims and six of its defenses after the close of testimony. The court, however, entered summary judgment in favor of the defendants on Geac's claim for misappropriation of trade secrets. On the remaining issues, the case was tried to a jury which returned a verdict in favor of the defendants. The Court denied Geac's motions for a judgment as a matter of law after trial and for a new trial. Geac timely appealed. The Court also rejected Grace's claim for attorneys' fees. Grace timely cross-appealed. We affirm in part and reverse in part.

I.

BACKGROUND

A. GEAC'S MILLENNIUM SOFTWARE

Among the United States copyrighted products owned by Geac are twelve different software business applications, collectively known as Millennium. These applications keep track of a host of business information, such as accounts payable, taxes payable, accounts receivable, fixed assets, and others. Trade secrets and highly confidential information are found in a wide variety of materials relating to Millennium, including but not limited to: (a) source and object codes for applications and operating software; (b) software documentation; (c) software upgrades; (d) manuals and materials for training, installation, service and maintenance; and (e) customer lists and other information about the specific needs of its licensees. Geac faces substantial competition for all of its Millennium products, and its confidential information and trade secrets allow it to compete effectively and advantageously.

Geac authorizes its customers to use its Millennium software under licensing agreements that contain protective provisions for its trade secrets and copyrighted properties.

The licensing agreements provide, inter alia, that if a customer engages a third party consultant to install or configure the software to the customer's needs or for

4

maintenance, the consultant must execute a non-disclosure agreement acceptable to Geac. Geac also offers maintenance service to its customers for its Millennium software which includes, among other things, telephone support, repairs, fixing program errors ("bugs"), and updated versions of Millennium. Millennium runs on a large mainframe computer that is typically licensed to large corporations and institutions, with the customers electing which of Millennium's twelve copyrighted software applications it wants to license.

At issue here is the Human Resources application known as HR:M. This application enables licensees to perform various payroll, benefits, and other employee-related functions in any jurisdiction in the United States. HR:M consists of numerous individual programs, each of which are self-contained units of code. Each of the programs performs one or more of the many individual tasks comprising the application. One of such programs is Geac's W-2 PAYTXABR. This W-2 program enables employers to prepare employee W-2s and related year-end reports required by federal and state taxing authorities.

B. GRACE'S OPERATIONS

Grace Consulting, Inc. is a New Jersey corporation with its principal place of business in Verona, New Jersey, and is engaged in the business of computers and software consulting. Anthony Ilutzi, a New Jersey resident, formed the company to provide consulting services to Geac licensees. This company also does business as Grace Maintenance, Int., which was formed in 1993 to provide a program of maintenance support services for Millennium. We refer to them collectively as Grace. Grace's activities in implementing their services apparently triggered this suit by Geac.

Commencing in 1993, Grace offered and performed services for Geac's licensees, including customizing Millennium software for their specific needs, fixing "bugs" in Millennium software, providing tax and regulatory updates, and modifying Geac's programming language code.2

_____

2. Instructions for a computer program may be written in any of three different levels of computer language.

5

Grace began offering Millennium licensees Grace's "Remain on Release" program, which provides Geac customers with Grace's own version of Geac's W-2 program. Grace

represented that this software maintenance program
"allows customers to stay on their present release without
having to accept expensive upgrades from the vendor."
Under this program, Grace purported to save Geac
customers considerable money they presumably would pay
Geac under its maintenance program.

Grace's W-2 software was initially developed by Cook &
Reynolds Services, Inc. (CNR), a company formed by two
former Geac employees, Stan Cook and Rick Reynolds. In
1996, Grace purchased the rights to CNR's W-2 program,
revised it, and renamed the individual programs to begin
with a "GMI" prefix instead of "CNR." The CNR W-2 then
became known as "GMITXABR."

---

> Computers can "understand" (that is, execute) only programs in
> "machine language" -- the lowest level. A machine language is a
> cluster of "0" and "1" symbols called"bits," which are the only
> symbols recognized by digital computers. A program consisting of a
> sequence of machine language instructions is referred to as "object
> code."
>
> To make it easier for humans to read and write programs, two
> "higher" levels of languages exist. The first level is "assembly
> language." Assembly language instructions consist of alphanumeric
> labels rather than bits. To be executed by the computer, the
> alphanumeric instructions must be translated into their
> corresponding clusters of bits by another computer program known
> as an "assembler." At the next level are "high-level" computer
> languages, such as FORTRAN or COBOL, that employ English-like
> words and syntax and are therefore easier to use and understand
> than assembly or machine language. Each high-level instruction is
> the equivalent of several assembly or machine language
> instructions. A computer program known as a "compiler" translates
> high-level programs into the corresponding object code. Programs
> written in assembly or high-level languages are referred to as
> "source programs" or "source code."

Copyright Protection of Computer Program Object Code , 96 HARV. L. REV.
1723, 1725 (footnotes omitted).

C. GEAC'S LICENSING AGREEMENTS

Geac has two standard Millennium licensing agreements
that are at issue here: the DBS and the McCormack and
Dodge (M&D) agreements (collectively, the License
Agreements). The DBS License Agreement prohibits anyone
from modifying Geac's Millennium software without Geac's
authorization. The M&D License Agreements permit a third
party consultant, in limited instances, to modify the Geac
code, provided it satisfies the Agreement's non-disclosure
and work-for-hire prerequisites for accessing the code.

Both of Geac's License Agreements prohibit the removal
of the Geac code from the licensee's site. The M&D License
Agreement authorizes and limits the licensee to use the

system solely for its own internal operation on any central processor within Customer's data center at the location designated on the "Customer and Product Information Schedule" or, with the prior approval of Geac, at a designated replacement site or service bureau. This Agreement defines use as "copying any portion of a Licensed Program . . . or transmitting [it] to a computer for processing of the instructions or statements contained in the Licensed Program." The Agreement expressly provides that "customer[s] shall not copy the System, in whole or in part, except as expressly provided in the [M&D] license agreement." The DBS License Agreement also restricts the use, including copying, of the Geac source code, solely for "purposes on the Hardware and Operating System Software at the Site." Both License Agreements bar the distribution of modified versions of the code. It is undisputed that approximately 35% of Grace customers are subject to the DBS license agreement and 65% are subject to the M&D license agreement.

In relevant part, the M&D License Agreement specifically provides:

> - Customer may also disclose M&D confidential information to Customer's consultants who have been retained to perform work for hire in connection with Customer's use of the System. All Customer consultants having access to M&D confidential information will be required to execute a non-

> disclosure agreement acceptable to M&D prior to disclosure.

> - Customer shall not copy the System, in whole or in part, except as expressly provided in this section. The System may be copied, in whole or in part, in printed or machine readable form, for use by Customer at the designated site, for archive or emergency restart purposes, to replace a worn copy, to understand the contents of such machine-readable materials . . . ."

At trial, Geac's counsel conceded that "under the M&D license, we allowed customers and consultants that qualified, to modify the source code for that customer only."

In relevant part, the DBS Software License Agreement specifically provides:

> - Customer may make a reasonable number of copies of the Program exclusively for testing, disaster recovery, inactive back-up or archival purposes.

> - Each party shall hold Confidential Information of the other in confidence . . . . All Confidential Information shall remain the sole property of the disclosing party.

> - Upon execution of a satisfactory nondisclosure
>   agreement, third parties may have access to
>   Confidential information.
>
> - All programs and Documentation, and any
>   modification or copies thereof are proprietary and
>   protected by copyright and/or trade secret law and
>   no ownership rights are transferred by this
>   Agreement.
>
> - Customer shall not modify, reverse engineer, reverse
>   assemble or reverse compile any Program or part
>   thereof . . . .

In addition, all third party consultants engaged to work
on software products licensed by Geac to its customers are
required to execute a consultant's non-disclosure
agreement.3 It provides, in relevant part, for an

_____

3. The consultant non-disclosure agreement allows Consultant access to
certain proprietary and confidential information about the Program,

acknowledgment by the Consultant of the secret trade
status of the source code, program and system design
specifics and all related items or materials developed by or
licensed to the licensee. It also requires an agreement to
abide by all of the terms of these provisions, using items
only in accordance with the license agreements and making
no duplicates of any items except with the written consent
of the vendor as necessary in the course of any
employment.

_____

modifications thereto and derivative works thereof, upon the following
conditions:

> - Consultant may use the Confidential Information, including
>   adapting, modifying and crating derivative works of the Program,
>   solely for purposes of assisting Customer in evaluating the
>   Program and/or implementing or modifying the Program at
>   Customer's facility to meet Customer's particular requirements.
>   Consultant may not use the Confidential Information to perform
>   maintenance services for Customer or for any other purposes,
>   and may not in any event distribute the Confidential Information
>   to any third party including other DBS licensees.
>
> - All adaptations and modifications to the Confidential Information,
>   and all derivative works thereof shall be deemed to be the sole
>   property of [Geac], whether prepared by [Geac], Customer,
>   Consultant or any other party. Consultant agrees that any such
>   adaptations, modifications and derivative works prepared by
>   Consultant for Customer shall be deemed to be work for hire as
>   defined under the U.S. copyright law.
>
> - Consultant shall have no right to use, copy or disclose the

Confidential Information, in whole or in part, except as
authorized herein. Consultant may disclose the Confidential
Information only to DBS's or Customer's employees in the scope
of their employment who have a need to know and to obtain
access thereto for the purposes described above and who are
bound by a written agreement with Consultant to maintain the
confidentiality of such Confidential Information in a manner
consistent with this Agreement.

- All tangible Confidential Information and any copies thereof, shall
be promptly returned to DBS or destroyed at DBS's option upon
request of DBS or upon termination of this Agreement.

9

D. INFRINGEMENT CLAIMS

Geac claims that one of its most important software
products is its Millennium package, including the twelve
separate programs which compose it. It alleges that it has
never authorized defendants to market or license
Millennium software or upgrades, either to the general
public or to specific business clients. The defendants,
however, it asserts, have induced one or more of Geac's
customers to provide them with Millennium software,
upgrade programs, documentation, and customer lists, all
of which constitute confidential information of Geac. Geac
further alleges that Ilutzi and Grace have illegally and
without Geac's permission copied these proprietary
materials and used the confidential information to solicit
directly in competition with Geac existing Geac licensees
and provide them with software and maintenance service
for Geac software. By improperly taking this confidential
information and software programs, Geac alleges that Grace
has avoided a substantial investment in time and money
that Geac found necessary to develop the Millennium
confidential package. Grace, therefore, has been able to
offer their services at prices significantly lower than those
charged by Geac. Further, Geac asserts that Grace has
improperly used Geac's confidential information and
materials to upgrade and alter Millennium software.

In a systematic attempt to lure away Geac's software
maintenance customers, it alleges that Grace has
disseminated advertising and marketing materials 4 to
existing Geac licensees using Geac customer lists to which
Grace had no right to access, as well as confidential and
proprietary information and materials which they had no
right to possess or use.

Geac claims of copyright infringement may be divided
into three general categories. First, Geac claims that the

_____

4. An excerpt of the nature of the marketing materials states: "GMI has
its own proprietary Year End processing software for HR:M. This
software was developed by Rick Reynolds and Stan Cook, both former
developers of the M&D HR:M package and is in use at our maintenance
clients as well as clients who are continuing on DBS maintenance but

have found our W-2 process to be superior to the vendor's process."

defendants have infringed upon the aforesaid copyrights
not only by copying and obtaining unauthorized copies of
Millennium programs and documentation but loading such
copies into computer memory and delivering unlawful
copies to Grace's customers, and amending the Millennium
software. These acts of infringement, it asserts, were
committed for the purpose of marketing, maintaining, and
upgrading Millennium software without Geac's authority.
Second, it claims that Grace's W-2 program contains literal
copying of Geac's PAYTXABR package. Third, it also asserts
that Grace's use of the Copy and Call commands to access
Geac's software infringes.

In its answer to Geac's complaint, Grace states that it
has entered into one or more Consultant's Confidentiality
Agreements with Geac, but denies generally all other
allegations of infringement alleged in the complaint. It
claims that the consulting services it performed did not
infringe because: (1) no copying was performed; (2) no
derivative works were created; (3) any copying, if performed,
was inadvertent and de minimis; (4) the "call and copy"
commands used in providing services were non-infringing;
(5) Geac licensing agreements authorized its customers to
use maintenance services like Grace; and (6) the services
that Grace performed comported with "standard industry
practice" and Geac's licensing agreements.

In addition, Grace pled counterclaims for breach of
contract and tortious interference. At the close of
testimony, the District Court struck the following defenses:
(1) copyright misuse defense; (2) de minimis defense; (3)
waiver defense; (4) estoppel defense; (5) 17 U.S.C.S 117
defense; and (6) fair use defense. One of the struck
defenses that Grace has cross-appealed only for is the
copyright misuse defense. On appeal, Grace contends that
as required by Section 15 of the License Agreement, it
entered into non-disclosure agreements with each licensed
customer it served in which each consultant agreed to
protect the confidentiality of the software. It further argues
that Geac's course of conduct demonstrated that
consultants like Grace "were expressly permitted" to provide
"maintenance to licensees." If there was some copying, it
was de minimis and, therefore, not infringing.

II.

THE MOTION FOR JUDGMENT AS A MATTER OF LAW

Geac presented two motions for judgment as a matter of
law during a complex and difficult trial and one after the
jury returned its verdict for the defendants. The trial court
denied each of them. A trial court's denial of motions for

judgment as a matter of law during the trial and after the verdict by the jury must be affirmed where the evidence viewed in a light most favorable to the non-moving party contains a "minimum quantum of evidence" reasonably to support the jury's verdict. Kuth v. Truck Stops of Am., 909 F.2d 743, 745 (3d Cir. 1990). Our review of a District Court's action in each of these instances is plenary. Id. In denying plaintiff 's motion for judgment as a matter of law, the trial judge stated that she believed there was ample evidence on which the jury could have decided that the defendants were not liable for copyright infringement. She offered no explanation on what evidence she relied for her conclusion.

A motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the benefit of every favorable and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In assessing whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is insufficient to sustain a verdict of liability. Lightning Lube, Inc. v. Metro Corp. , 4 F.3d 1153, 1166 (3d Cir. 1993). Thus, although the court draws all reasonable and logical inferences in the non-movant's favor, we must reverse an order denying judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence.

Although we do not set aside a jury verdict lightly or without careful review of the complete record, we must grant judgment here in this case as a matter of law because

12

there is plain evidence of copyright infringement. When the record is distilled, filtered, and shaken down, 5 it becomes apparent that there is no legal basis for such infringement.

A. COPYRIGHT LAW

We commence our analysis with the relevant provisions of the copyright law. Beginning with the federal Constitution, copyright protection has enjoyed a revered place in our national legal system and in the development of the arts, sciences, the economy, and industrialization of our nation. Under Constitutional mandate, Congress is specifically empowered "To promote the Progress of Science and useful Arts, by securing for limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. ART. I, S 8. Congress enacted the first copyright statute as early as 1790. The existing copyright laws are codified in the Copyright Act of 1976 (the Act). This Act contains a complete revision of copyright law in response to far reaching new developments made in technology and the sciences. Congress amended

the Act in 1980 expressly to extend copyright protection to computer programs and derivatives. 17 U.S.C. SS 101 et seq.

The Copyright Act as amended provides, in relevant part, that:

> (a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of machine or device. Works of authorship include the following categories: (1) literary works:

_____

5. Counsel for the parties were not of much assistance to the court with respect to the contents of the record. The joint appendix consisted of many volumes and supplemental appendices but the index to them does not identify or refer to a single witness by name. Typical references to the testimony are: "Excerpts of transcript trial" and date. This is meaningless and frustrating to the court. Moreover, the transcript of testimony also fails to identify the witness under examination.

13

17 U.S.C. S 102(a). Computer programs are entitled to copyright protection as "literary works." Whelan Assoc. v. Jaslow Dental Lab., 797 F.2d 1222, 1234 (3d Cir. 1986).

To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff 's work. Whelan, 797 F.2d at 1231; Gator Rubber Co. v. Bondo Chem. Indus., 9 F.3d 823, 831 (10th Cir. 1993). Copying is a "shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. S 106." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir. 1991). Of relevance here, 17 U.S.C. S 106 provides:

> Subject to sections 107 through 121, the owner of copyright . . . has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

In the instant case, the ownership of the copyrighted property is undisputed, as is its validity. The United States Copyright Office issued to Geac certificates of registration

for all programs contained in its Millennium software package. What remains at issue is the copying, and much of the evidence in support of the plaintiffs' claim comes from the lips of Grace's president and its other witnesses. As we previously noted, supra, we divide Geac's claim into three parts. First, Geac claims that the defendants infringed upon their copyright by copying their software in the course of providing consultant and maintenance services to Geac's licensees. Second, Geac claims that Grace's W-2 programs contain literal copies of PAYTXABR. Third, Geac also asserts that Grace's W-2 program contains Copy and Call commands to Geac's source and object codes.

14

## B. PAYTXABR AND DE MINIMIS

Initially, Grace performed maintenance work for Geac's licensees as to which Geac made no complaint. However, commencing in 1993, Grace expanded its activities beyond maintenance service to provide Geac's customers with software, particularly a program it called the "Remain on Release." Geac viewed the expanded activities beyond mere maintenance, and especially the sale of Grace software, as a violation of its exclusive rights under the Copyright Act to make and distribute derivative works of its Millennium programs.

Grace offered and sold a program that it obtained by copying and modifying Geac's copyrighted Millennium product known as PAYTXABR. Grace distributed and sold it as its CNRTXABR program. It acquired this program from Cook and Reynolds, and immediately renamed it the GMITXABR program.

Reynolds testified categorically on direct examination that his W-2 program was in no way similar to HR:M's (DBS Millennium) program. This unexplained statement, however, lacks substance and verity because it is wholly inconsistent with his testimony concerning the origin of his program. He testified that when he was installing programs presumably on behalf of Dun & Bradstreet's licensee Super Foods in Ohio, their local school district "wasn't showing up on the W-2." Reynolds, thereupon, asked for a copy of the PAYTXABR program. Then "I made a copy and renamed it CNRTXABR," and then made a fix for Super Foods to pick up the local school tax. He acknowledged that CNRTXABR "should have stayed at Super Foods and shouldn't have been distributed with the other code - a bad idea." This is a plain statement of the root of his infringement.

On cross-examination, he testified:

> Q: Could you have written the CNR W-2 program without making either copies or calls to Dun & Bradstreet copy members or source code?

> A: No.

Reynolds's denial of infringement is also inconsistent with earlier testimony given by Ilutzi under cross-

examination wherein he admitted unequivocally that CNR W-2 "makes copies and calls to Geac codes" and that CNR's W-2 contains CNRTXABR. Ilutzi also admitted that Grace initially distributed CNRTXABR as part of its W-2 software, later renamed and replaced it as part of its W-2 software with GMITXABR, and distributed it as part of its W-2 software. Ilutzi testified:

> Q: Do you admit that CNR W-2 makes copies and calls to Geac codes?
>
> A: Yes.
>
> Q: Do you admit that CNR W-2 contains CNRTXABR?
>
> A: Yes.
>
> Q: Do you admit that GMI W-2 makes copies and calls to Geac code?
>
> A: Yes.
>
> Q: Do you admit that GMI W-2 contains GMITXABR?
>
> A: Yes.

Ilutzi further admitted that CNRTXABR was created by copying and modifying Geac's program PAYTXABR and that Grace's "CNRTXABR was used in the making of GMITXABR," both of which supplied the same tax program.

Grace's counsel conceded at trial that Grace was not contesting its use of Geac's PAYTXABR. "It is there and that's literal copying." Ilutzi conceded under cross-examination that CNRTXABR should not have been in the CNR W-2 program because it was copied from PAYTXABR. He directed at the end of 1996 that Grace discontinue distributing CNRTXABR. Grace's expert, Dewar, acknowledged that Grace's distribution of CNRTXABR and GMITXABR was contrary to "standard industry practice." However, he did not consider the distribution a copyright infringement because, in his opinion, it was de minimis.

In supporting its de minimis defense, Grace asserts that the quantitative infringement amounted to only twenty-seven lines out of 525,000 lines. This argument is irrelevant as a matter of law and we therefore will not tarry on the disputed factual element. The unrefuted trial

testimony was that if one considers Grace's use of Copy

and Call commands to gain access to PAYTXABR and the Geac code, the CNR W-2 program actually consists of 62% Geac code, and the GMI W-2 program possesses approximately 43% of Geac's code. Much more significant, however, than the quantity of copy is the quality of the material purloined.

A de minimis defense does not apply where the qualitative value of the copying is material. Kremin, Geac's technical expert, and Dr. Dewar, Grace's expert, both agree that Geac's software would not work if PAYTXABR were removed from it and that Grace's infringing W-2 software would not work without its copies of PAYTXABR. Thus, the information Grace copied was highly critical. In Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564-66, (1985), the Supreme Court rejected a claim that copying 300 to 400 words of a copyrighted book was insubstantial and constituted fair use of the material. The Court looked to the "qualitative value of the copied material, both to the originator and to the plagiarist." Id. at 565; see also Educational Testing Serv. v. Katzman, 793 F.2d 533, 542 (3d Cir. 1986). The trial judge appropriately struck the de minimis defense with respect to PAYTXABR from her jury charge and Grace does not contest this ruling. For the foregoing reasons, Grace's de minimis argument made on appeal also must be rejected.

C. GRACE CONSULTING AND MAINTENANCE ACTIVITIES

We turn to Geac's second claim of infringement arising out of Grace's consulting and maintenance activities. In support of its infringement claims, Geac contends that Grace's witnesses admitted also copying Geac's copyrighted source code while fixing bugs, creating tax updates, customizing Millennium, modifying the program language code, and compiling, link editing and testing Millennium. Ilutzi admitted to modifying many of Geac's programs in all twelve Millennium applications. This modification was "large scale," and included compilation, link editing,6 and

---

6. Dr. Dewar, Grace's expert, explained that"compiling" is a program that converts source code, which can be read by humans, into object

17

testing of GMI W-2 software with the DBS code at customer sites, and modifying the Geac program language code. He further stated unequivocally that in fixing bugs and in adding features, Grace consultants have modified DBS's source code. When asked whether he would admit that his consultants would find it easier to copy and modify Geac's source code and cheaper for his customers rather than create a program from scratch, Ilutzi replied "absolutely." He also responded affirmatively when asked whether his consultants would take Geac's software if one of his customers "wants software to perform a particular function."

We address Grace's contention that notwithstanding all of the foregoing evidence of infringement, none occurred. It asserts that both the terms of the License Agreements and Geac's course of conduct confirm that Geac expressly permitted computer consultants to provide maintenance to its licensees. Grace's position in general at trial and on appeal is that the License Agreements raise factual issues of interpretation.

We examine the M&D License Agreement wherein Grace claims authorization to copy Geac's programs. Grace refers to Paragraph 16 of the License Agreement that permits the consultant to copy a limited number of copies to be made or remain in existence at any one time "for use by the customer." However, Grace omits reference to a significant portion of Paragraph 16 which provides:

> Customer shall not copy the System, in whole or in part, except as expressly provided in this section. The System may be copied . . . for use by Customer at the designated site, for archive or emergency restart purposes, to replace a worn copy, to understand the contents of such machine-readable materials, or to store at the off-premises location which Customer uses for security storage purposes, provided, however, that no more than 10 printed copies and 10 machine-

---

code, which is binary, consisting of ones and zeroes that computers can read. Link editing further processes the object code into "executable files," which can then be run on the computer.

18

> readable copies will be in existence under this license at any one time without prior written consent from M&D.

(Emphasis added).

Grace, however, asserts that its consulting and maintenance activities complied with the custom and industry practice. Paragraph 15 of the License Agreement does permit licensees to provide access to consultants they have hired to Geac's confidential information provided the consultants have executed a non-disclosure agreement acceptable to the licensor prior to disclosure. 7 Grace also contends that as required by Section 15 of the License Agreement, it entered into non-disclosure agreement with each licensed customer it served in which each consultant agreed to protect the confidentiality of the software.

The License Agreement between Geac and its licensees was crucial in the trial of this case. The record supports plaintiffs' arguments that many of the defendant's witnesses admitted to conduct which, in the absence of authorization from Geac, amounted to infringement of Geac's copyrights. These acts included copying its code,

creating and distributing derivative works, and the extensive sale and marketing of Grace's W-2 program.

Unless authorized by Geac, its right to create derivative works has been usurped by Grace, whose product instructs the computer to incorporate Geac copyrighted material with its W-2 program. This derivative work exists in a concrete or permanent form and substantially incorporated protected material from the pre-existing work. See Micro Star v. Formgen, Inc., 154 F.3d 1107, 1110 (9th Cir. 1998).8

_____

7. Customer may also disclose M&D confidential information to Customer's consultants who have been retained to perform work for hire in connection with Customer's use of the System. All Customer consultants having access to M&D confidential information will be required to execute a non-disclosure agreement acceptable to M&D prior to disclosure.

8. The Copyright Act defines a derivative work as:

> a work based upon one or more preexisting works, such as a translation . . . condensation, or any other form in which a work

19

Grace also copied Geac's copyrighted software code in creating bug fixes for Millennium, creating tax updates and customizing Millennium, making Millennium "year 2000 compliant," modifying the program language code, and compiling, link editing and testing Millennium. Ilutzi acknowledged that he has written enhancements for his clients for Geac's HR:M program and readily agreed that he used Call or Copy for their programs.

John Rasnic, a Grace computer consultant, testified when deposed that he worked on Millennium software; that he made a copy of a portion of the Millennium source code disks; that clients (naming some) have sent Grace floppy disks with Millennium downloaded to Grace at offsite locations. Rasnic also admitted to physically downloading pieces of Millennium's source code from customers' mainframes at the customers' premises and then taking with him the floppy disks containing downloaded Millennium source code when he left the premises. He also acknowledged transferring those disks loaded with Millennium source code onto a personal computer at his Illinois offices, which are not physically located on the customer premises. The computer, Rasnic testified, can then make, at his direction, copies on the hard drive of what was on the floppy disk.

During his service with Grace, Rasnic performed this operation at this office "once a quarter to twice a week." A copy of the Millennium source code has remained in his personal computer on its hard drive for four to five weeks. At the time he was deposed, he stated that he had copies of the Millennium source code on his hard drive for the purpose of "doing a modification for Food Line[a customer]

of that program." He also stated that he has modified the source code at his Illinois office for other "Grace clients only." Generally, the kinds of work he performed for the

---

> may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modification which, as a whole, represent an original work of authorship, is a "derivative work."

Id. S 101.

customers were telephone support, problem resolution, upgrades and modifications, and interfaces.

The License Agreements provide that third parties, including customer consultants, may have access to confidential information, including the Millennium program, upon execution of a non-disclosure agreement acceptable to [Geac] prior to disclosure. Although Grace asserts that every one of its consultants signed a non-disclosure agreement when they worked on DBS software, we can find none of record except the Hutto document. Grace fails to point to any evidence of non-disclosure agreements signed by it or its employees with any of its customers; it claims a blanket authorization under the "Hutto-VA" agreement permitting access to Millennium.

Hutto, a vice-president of Dun and Bradstreet, executed a non-disclosure document in 1993. The document fails to state the name of any customer for whom the services were to be performed. It is silent as to the duration of the period of service. Geac claims that this "Hutto" agreement applied only to the University of Virginia for whom Grace proposed to do maintenance work and was not a general authorization. Grace argues that "Hutto testified that the agreement was not limited to any one licensee and was satisfactory for any licensee." This argument, however, is a distortion of what Hutto stated. He testified that the agreement was satisfactory "as it related to the[University of Virginia]." The trial court ruled against Grace's claim of blanket authorization stating that "there is not a sufficient quantum of proof to establish that we have a contract . . . understood by both sides, and the same way." The court, therefore, would not permit this document to go to the jury. Grace has appealed this ruling.

Hutto testified the agreement was only intended"for the particular customer" with whom they were dealing at the time, the University of Virginia. He never intended it to be a blank non-disclosure agreement with third-party consultants. Moreover, there was no discussion by him with Grace's representative that the agreement include others than the University of Virginia. In addition, it is unrefuted that he had "no authority" to enter into a blanket non-disclosure agreement. Although he further testified

that an agreement containing similar language would have been satisfactory with respect to other customers, he did not testify, as Grace would have this Court believe, that "the agreement was not limited to any one licensee." The other evidence, particularly the use of the plural in the word "licensees" and the letter of Grace's counsel to Hutto, is of very little probative value. Reference to the plural in "licensees" in the agreement is indeed a slender reed on which to cling. We see no error in the District Court's conclusion that "there's not a requisite quantum of evidence that the contract entered into between the parties had a meeting of the mind."

The defendants offer an additional pellet in defense of their consulting and maintenance operation. They claim that their offsite activities in copying the source code and other elements of the program were justified by industry custom and practice.

Grace emphasizes that it was industry practice to allow programs off-site and that customers required such off-site work, especially in emergency situations. Furthermore, it asserts that Section 16 of the License Agreement allows off-site activities, and that the provisions of the License Agreement "demonstrate that it does not preclude off site work." It maintains that its off-site activities are limited to reviewing the program to understand it so that necessary fixes can be made to the software in the customer's mainframe computer. It contends that this section"makes clear that such activities are allowed." A defense of industry custom and practice in the face of the protective provisions of the Copyright Act could undermine the purposes and objectives of the statute and reduce it to rubble.

Grace may not stultify itself by seeking shelter within selected terms of the License Agreements at one time and then, when it serves its convenience, disregard the conditions and other pertinent terms of the Agreements. Custom and practice in the computer industry, and the evidence of it in this record is vague and conclusory, is no authority to disregard or trump the specific terms of a valid license agreement or the provisions of the Copyright Act. "Custom and usage may not be invoked to relieve defendant of the clear cut obligations imposed by the application of

the statute." Famous Music Corp. v. Seeco Records, Inc., 201 F. Supp. 560, 566 (S. D. N.Y. 1961) Extrinsic evidence may not be used to nullify or modify the terms of a valid, unambiguous license agreement. See Atlantic Northern Airlines v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953). "Extrinsic evidence . . . may not be used to create an ambiguity where none exists." International Union v. Skinner Engine Co., 188 F.3d 130, 145 (3d Cir. 1999).

As previously noted, the Copyright Act gives the copyright owner the exclusive right to prepare derivative works based on the copyrighted work. 17 U.S. S 106. The District Court correctly defined a derivative work to the jury as"a new created work based on the original copyright work."9 Grace's W-2 program using Copy and Call commands copies Geac's computer copyrighted code. Thus, it is a derivative work; the inclusion of the Copy and Call commands makes Grace's W-2 programs infringing, derivative works of Geac's copyrighted software.

Grace attempts to brace its argument of industry practice to use these commands to retrieve data for maintenance work by arguing that the copy command does not modify the code. It also argues that the Copy and Call commands are used to access customer's data, which belongs to the customer and is not protected.

Section 2 of the M&D License Agreement provides in relevant part that the customer is authorized to use"the system solely for its own internal operation . . . within Customer's data center at the location designated on the Customer and Product Information Schedule, at any other site which may replace it as provided in this section, or through a service bureau upon written prior approval of M&D." Paragraph 3 of that section permits use of the system in a remote job entry mode for the benefit of the customer and its subsidiaries provided that all processing involving use of any Licensed Program takes place only at the designated site or its temporary replacement."

_____

9. Under the Copyright Code, 17 U.S.C. S 101, a derivative work is work "based upon one or more preexisting works" and includes any recasting, transforming or adopting of the original work. Whelan, 797 F.2d at 1239.

23

The limitation of the license authorization to the customer's site and for its own internal operation is plain; use elsewhere may be permissible but with written prior approval of the licensor. Neither License Agreement permitted customer off-site use of the Geac code except with its prior approval. The License Agreement also forbade the distribution of modified versions of the Geac code. Section 16 of the agreement relied on by Grace is not inconsistent. It allows system copying, in whole or in part "for use by Customer at the designated site" and then under specific conditions and purposes set forth in that section. Such copying as is permitted at the site is only for purposes of "understand[ing] the contents of such machine readable materials." The interpretation of a written unambiguous agreement traditionally is a matter of law, not a question of fact for a jury. Church v. General Motors Corp., 74 F.3d 795, 799 (7th Cir. 1996); see also Winter v. Minnesota Mut. Life Ins. Co., 199 F.3d 399, 406 (7th Cir. 1999). We therefore hold that the terms and conditions of the License Agreements may not be altered or modified by extrinsic incidence of purported industry custom and

usage.

D. GRACE'S W-2 PROGRAM

We turn now to Geac's third claim -- Grace's use of Copy
and Call commands to Geac's W-2 program. Grace
contends that the Call and Copy commands are used to
access customer's data, that such data belongs to the
customer, and is not protectable. It asserts the Copy
command does not modify the code and that industry
practice uses the commands "to interoperate two systems;"[10]
the Copy command does not insert text from one program
into another; their program remains separate in memory.
Grace admitted that the installation, testing, compiling and
link editing of its W-2 programs required copying Geac's
software and link editing the Geac code. Geac therefore

_____

10. Defendant Grace asserts in Geac's brief filed at trial dated April 19,
2000, it conceded "that whether the call and copy" commands infringe is
an issue to be decided by the jury. We can find no such concession in
the record to which it refers.

24

argues that these trial admissions compel the conclusion
that, "as a matter of Law," Grace's W-2 programs are
infringing because they contain copies of Geac's copyright
code and are derivative works of Millennium. We agree.

Citing to Walker v. University Books, 602 F.2d 589, 564
(9th Cir. 1979), Geac further asserts that the Copyright Act
does not allow an infringer to avoid liability by distributing
instructions which result in copying. The Act gives a
copyright owner the exclusive right to "prepare derivative
works based upon the copyrighted work." 17 U.S.C.S 106.
The Act also defines a "derivative work" as "a work based
upon one or more pre-existing works [including] any other
form in which a work may be recast, transformed or
adapted." 17 U.S.C. S 101. Furthermore, the DBS License
Agreement prohibits anyone from modifying the Millennium
software code without Geac's authorization. The M&D
License Agreement permits a third party consultant, in
certain instances, to modify the Geac code, but only if it
satisfies the agreement's non-disclosure and work-for-hire
requirements for accessing the Geac code. Grace did not
meet the License Agreements and non-disclosure
requirements. Thus, Geac posits that this results in literal
copy and modification of Geac's W-2 program that
constitutes a derivative work of the copied and called
programs and code.

We turn to Grace's defense that its CNR W-2 program
and the DBS Millennium W-2 programs are not similar and
Grace, therefore, does not infringe on Geac's copyright.
Grace makes much of the government form that both
generate for their customers and that this is a government
form unprotected under copyright law. Of course, it is
unprotected, and is not an issue. However, there is no

claim that the other material in the PAYTXABR package is not copyrighted property.

Grace also leans on Dr. Dewar's testimony to support its argument that the two programs are dissimilar. Dr. Dewar found similarities in the two programs at the upper level but found them different at the lower levels.[11] No further explanation is offered by Dr. Dewar as to what are the

_____

11. For descriptions of "upper" and "lower" levels, see p.6, n.2, supra.

differences, except for a vague reference to Grace's "extraction program."

The source code which speaks in human language, and is critical, is at the upper level. This infringement may not be justified on the ground that not all elements of the system were copied or that there were some dissimilarities. Grace may have rearranged some of the words in the plagiarizing program or altered or replaced one or more components in its program, but these efforts to distinguish its program from Geac's system does not erase the literal copying of Geac's source code; it does not surmount Reynolds' acknowledgment that "I could not have written the W-2 program without making either copies or calls to Dun & Bradstreet copy members or source code."

We had occasion in one of our early cases dealing with substantial similarity wherein the defendant's premise was that one cannot prove substantial similarity without comparing the entirety or a greater part of the work. We concluded that not in every area of copyright infringement is there a general requirement "that most of each of two works be compared before a court can conclude that they are substantially similar." Whelan, 797 F.2d at 1245. The source code and the object code are the literal elements of a computer program and are protected by copyright law. Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1249 (3d Cir. 1993); Cognotec Services v. Morgan Guar. of New York, 862 F. Supp. 45, (S.D. N.Y. 1994).

Dr. Dewar conceded that Grace made copies of Geac's code by its Call commands to Geac's software when Grace compiled it W-2 program. He testified that so long as Geac's licenses used Grace's program, the coping through the Copy and Call commands is non-infringing because the licensee had authority to access. This is sophistry with which we do not agree. Authority to the licensee to access both programs does not give Grace the right to copy and call Geac's copyrighted property for its own commercial and competitive purposes. As we have already explained, this infringement cannot be excused by purported industry practice. Having copied the critical source code, it is no defense to infringement that more of the system was not

copied or that the plagiarist's system may have some
dissimilarities from the original system.

Turning to its last defense, Grace relies on Computer
Associates International, Inc. v. Altai, Inc., 982 F.2d 693 (2d
Cir. 1992) and Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366 (10th
Cir. 1997). This defense to the use of the Copy and Call
command in Grace's W-2 program is predicated on the
doctrine of externalities, often referred to in a non-
computer literary setting as scenes a faire.

The Court of Appeals explained in Gates Rubber Co. that
under this doctrine, copyright protection is denied"to those
expressions that are standard, stock, or common to a
particular topic or that necessarily follow from a common
theme or setting." Bando Chemical Industries, Ltd., 9 F.3d
at 838. As related to computer programs, the Court of
Appeals for the Second Circuit in Altai recognized that "in
many instances it is virtually impossible to write a program
to perform particular functions in a specific computing
environment without employing standard techniques." 982
F.2d at 709 (quoting 3 Nimmer S 13.03[F][3], at 13-65).
That is because "a programer's freedom of design choice is
often circumscribed by extrinsic considerations such as (1)
the mechanical specifications of the computer on which a
particular program is intended to run; (2) compatibility
requirements of other programs with which a program is
designed to operate in conjunction; (3) computer
manufacturers' design standards; (4) demands of the
industry being serviced; and (5) widely accepted
programming practices within the computer industry." Id.
at 709-10; see also Mitel, 124 F.3d at 1375. Thus, for these
reasons certain content of the allegedly infringed program
that might have been dictated by external factors may not
be subject to copyright protection. Altai, 982 F.2d at 710;
Gates Rubber, 9 F.3d at 838.

The Court in Mitel agreed, stating that the"traditional
copyright doctrine [of scenes a faire has been extended] to
exclude from protection against infringement those
elements of a work that necessarily results from external
factors inherent in the subject matter of the work." Mitel,
124 F.3d at 1375. The rationale is rather straightforward:
Because those external factors dictated the creation of the

27

allegedly infringed work, "it is lacking the originality that is
the sine qua non for copyright protection. Gates Rubber, 9
F.3d at 838 (citing Publ'n, Inc. v. Rural Tel. Serv. Co., 499
U.S. 340, 348 (1991).

Both Altai and Mitel clearly held that in determining
aspects of the program not entitled to protection because of
external factors, we examine the program from the
viewpoint of the creator. Altai, 982 F.2d at 714; Mitel, 124
F.3d at 1375. The Mitel court pointedly noted that the focus

is on the factual circumstances and the external factors surrounding the author of the infringed program. Mitel, 124 F.3d at 1375; see also Control Data Sys., Inc. v. Infoware, Inc., 903 F. Supp. 1316, 1323 (D. Minn. 1995) ("The question to be examined is whether external factors limited the choices available to the [allegedly infringed] programmers, not whether external factors may somehow limit the choices of [the alleged infringing work's] programmers.").

Dr. Dewar made it clear that he was advancing his own theory, explaining: "So my understanding of the process of determining for myself whether I consider something infringement, is that if something is dictated by the requirement of intraoperability, then that is an external factor that is not protectable." Explaining further, he testified:

> [I]n modern computing, the notion of intraoperability is fundamental. And the idea of writing programs which are designed to work with licensed copies of other programs, a fundamental part of computing, one of which everyone has a PC, . . . taking advantage of.
>
> And consequently it is exactly expected to, according to industry standard and practice relating to intraoperability, you will find two programs to design, to work and to interoperate, and in the same manner will have the same calls.

Dewar's testimony regarding external factors, including interoperability, is wholly misplaced. As Dewar admitted on cross-examination, he focused on externality from the viewpoint of Grace's W-2 program, not Geac's. He looked at externalities from the eyes of the plagiarist, not the eyes of

28

the program's creator. As explained, in determining whether certain aspects of an allegedly infringed software are not protected by copyright law, the focus is on external factors that influenced the choice of the creator of the infringed product. Altai, 982 F.2d at 714; Mitel , 124 F.3d at 1375. What is telling is that Grace makes no effort to explain this fundamental error on the part of Dewar except to urge that "external factors" and "interoperability" "are important concepts in proving that no infringement occurred." Furthermore, Dewar here simply offered no testimony regarding what parts of Geac's program were dictated by external factors and therefore not protected.

He therefore concluded: "My opinion, there's no infringement." His explanation ignores completely that Geac's Millennium program was designed and developed not for the purpose of working with personal computers but solely for business customers' specific human resource problems. Under his theory, the Copyright Act is superfluous and the License Agreements become a bundle of straw.

Dewar's explanation of the need to interoperate two programs, and industry practice and custom, do not justify unauthorized accessing and copying Geac's copyrighted code. The Court in Mitel specifically rejected the analysis of the district court in that case which focused on whether external factors such as market forces and efficiency considerations justified the copying. Mitel, 124 F.3d at 1375; see also Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1253 (3d Cir. 1983) (stating that achieving total computability with independently developed application program . . . is a commercial and competitive objective which does not enter into the somewhat metaphysical issue of whether particular ideas and expressions have merged). We also reject the doctrine of externalities, including interoperability, as justification for using the Copy and Call commands to access Geac's copyrighted software in violation of the License Agreements and the Copyright Code.

E. CONCLUSION

In conclusion, the interpretation of the License Agreements was a question of law and not of fact. The

defenses raised by the defendants were unacceptable as a matter of law. Drawing all reasonable and logical inferences in the non-movant's favor, we nevertheless must reverse the Order of the District Court denying Geac judgment as a matter of law on its copyright infringement claims. Upon our review of the record, it is evident that the verdict is not supported by legally sufficient evidence. In light of our decision on the motion for judgment as a matter of law, we do not reach the alternative issues relating to the motion for a new trial.

III.

MISAPPROPRIATION OF TRADE SECRETS

Geac also pled a state claim for misappropriation of trade secrets claim with respect to Grace's use of Millennium software. Geac argued that Grace breached multiple duties of confidentiality in creating and distributing its W-2 program and other derivative works. The District Court granted Grace's motion for summary judgment because it held that Geac's claim was preempted by S 301 of the Copyright Act, 17 U.S.C. S 301.

Our review of the District Court's grant of summary judgment is plenary; we apply the same test as the District Court should have applied initially. Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). Our review is de novo as to the question of law whether S 301 preempts a state cause of action for misappropriation of trade secrets. Trandes Corp. v. Guy F. Atkinson Co. , 996 F.2d 655, 658 (4th Cir. 1993).

Section 301(a) of the Copyright Act provides that:

> all legal or equitable rights that are equivalent to any
> of the exclusive rights within the general scope of
> copyright as specified by section 106 in works of
> authorship that are fixed in a tangible medium of
> expression and come within the subject matter of
> copyright as specified by sections 102 and 103 . . . are
> governed exclusively by this title. Thereafter, no person
> is entitled to any such right or equivalent right in any

> such work under the common law or statutes of any
> State.

17 U.S.C. S 301(a). However, subsection b(1) makes explicit
what is implicit in subsection (a) that the preemption
provision does not apply if the "subject matter[ ] does not
come within the subject matter of copyright as specified by
sections 102 and 103." 17 U.S.C. S 301(b)(1).

Subsection 301(b)(3) imposes another limitation that is
principally at issue here. It provides that "[n]othing in this
title annuls or limits any rights or remedies under the
common law or statutes of any State with respect to
activities violating legal or equitable rights that are not
equivalent to any of the exclusive rights within the general
scope of copyright as specified by section 106." 17 U.S.C.
S 301(b)(3). As already noted previously, section 106 gives,
subject to certain limitations, the owner of a copyright the
exclusive rights to do and to authorize among other things
the reproduction of the copyrighted material, the
preparation of derivative works, and the distribution of
copies. 17 U.S.C. S 106.

As the District Court acknowledged, this Circuit has not
yet addressed the effect of S 301 on the preemption of state
misappropriation of trade secrets claims. Although we have
not addressed the issue, we are not without guidance or a
framework. The Congressional House Judiciary Committee
Note accompanying S 301 clearly states that the intent of
S 301 "is to preempt and abolish any rights under the
common law or statutes of a State that are equivalent to
copyright." House Report No. 94-1476. The note stated,
however, that certain common law rights "would remain
unaffected as long as the causes of action contain elements,
such as invasion of personal rights or a breach of trust or
confidentiality, that are different in kind from copyright
infringement." Id. More specifically and most relevant to our
issue, the Committee noted that misappropriation type
claims are not necessarily synonymous with copyright
infringements. Id. Therefore, misappropriation causes of
action are not preempted if they are based on claims not
equivalent to the exclusive rights within the general scope
of the Copyright Act. Id.

Less clear is what types of misappropriation claims are not preempted and are not within the general scope of the Act. The House version of S 301, which Congress adopted, deleted the Senate version of S 301(b)(3) that had enumerated certain types of misappropriation claims that would not be preempted. Conference Comm. Notes , House Conference Report No. 94-1733. However, as the District Court acknowledged, because any direct reference was deleted to acts of misappropriation, federal courts have grappled with whether a particular cause of action and, more specifically, a particular type of misappropriation is preempted under "any of the exclusive rights within the general scope of copyright as specified by S 106."

Courts, as the Court of Appeals for the First Circuit acknowledged, have developed a "functional test" to determine the question of equivalence. Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1164 (1st Cir. 1994). There, the court held that "if a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action." Data Gen. Corp., 36 F.3d at 1164 (quoting Gates Rubber, 9 F.3d at 846-47); see also Trandes Corp., 996 F.2d at 659 ("To avoid preemption, a cause of action defined by state law must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by copyright law."); Altai, 982 F.2d at 716 ("[i]f an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption.") (citation omitted). This test has been labeled the "extra element" test. Trandes Corp., 996 F.2d at 659.

Not every extra element is sufficient to establish a qualitative variance between rights protected by federal copyright law and that by state law. Data Gen. Corp., 36 F.3d at 1164-65; Altai, 982 F.2d at 717. A state law

32

misappropriation of trade secrets claim that requires a proof of breach of duty of trust or confidence to the plaintiff through the improper disclosure of confidential materials is qualitatively different because it is not an element of copyright infringement. The breach of duty or trust represents unfair competitive conduct "qualitatively different from mere unauthorized copying." Data Gen. Corp., 36 F.3d at 1165. Thus, it has been held that trade secrets claim based upon a breach of duty provides the extra element avoiding preemption. Altai, 982 F.2d at 717 ("[t]he defendant's breach of duty is the graveman of such trade

secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying."); Trandes Corp. , 996 F.2d at 660 (agreeing "that the breach of a duty of trust or confidentiality comprises the core of action for trade secret misappropriation" qualitatively distinguishing it from copyright infringement); see also Gates Rubber , 9 F.3d at 847-48 (same).

Geac argues that "the district court erroneously concluded that Geac's software . . . claims were based simply on the use and copying of the software, rather than Grace's breach of its duties to keep Geac's software and client list confidential." The extra element, it argues, precludes preemption. We agree with Geac that if their misappropriation of trade secrets claim was based on such breach of duty of trust and confidentiality, it would survive preemption in this case. Thus, if an employee of Geac who, by virtue of a confidential position, had access to the source code, misappropriated it, and used it to promote his own interests, such breach of confidentiality would be the extra element to a copyright infringement claim. The claim, therefore, would not be preempted by the Act. See Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d. 823, 847-48 (10th Cir. 1993) (copyright claim for wrongful use of a computer program does not preempt trade secret claim for misappropriation where defendant gained access to the program through plaintiff 's employee who breached his duty to maintain secrecy).

Geac also argues that the District Court did not address Geac's misappropriation of trade secrets claim with respect

33

to its customer lists. Because customer lists are not subject to copyright, it argues, it cannot pursuant to S 301(b)(1) be preempted. Grace does not dispute that the customer lists are not subject to copyright and presumably escape preemption for that reason pursuant to S 301(b)(1). Further, it does not contest that customer lists could constitute valid trade secrets. See Lamorte Burns & Co. v. Walters, 770 A.2d 1158, 1166 (N.J. 2001) ("In New Jersey, customer lists of service business have been afforded protection as trade secrets.").

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment on an issue is appropriate only if the affidavits, depositions, and other evidence submitted in connection with the motion for summary judgment demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Seibert v. Nusbaum, Stein, Goldstein, Bronstein & Compeau, P.A., 167 F.3d 166, 170 (3d Cir. 1999). The court must "construe the facts in the light most favorable to the non-moving party." Seitzinger v. Reading Hosp. and Med. Ctr., 165 F.3d 236, 238 (3d Cir. 1999).

In entering summary judgment, the District Court failed to consider evidence that Geac's customer lists were not copyrightable material and, therefore, that claims alleging a violation of state laws were not preempted. See First Publications, Inc. v. Rural Tel. Service Co., 499 U.S. 340, 347 (1991) (data or facts "do not trigger copyright" because they are not original in the constitutional sense). Therefore, the claims that Grace misappropriated Geac's client lists were not preempted and the District Court as a matter of law should not have dismissed them.

With respect to Geac's software claims and the evidence in their support, the District Court concluded that they were based only on the use and copying of software and the codes. The court failed to consider evidence of the alleged breach of Grace's duties to maintain the confidentiality of Geac's software and customer lists. These trade secret claims were qualitatively different from the rights protected by the Copyright Act because Grace's evidence of breach of

confidentiality constituted the extra element necessary to avoid preemption.

Geac introduced evidence to the District Court that Grace was bound by express promises of confidentiality with respect to the software and customer list because, as a third party consultant, it had assumed an obligation of confidentiality under its own standard agreement with its customers. Furthermore, there is evidence that Grace employed former employees, and contracted with Reynolds, who owed obligations of confidentiality to Geac, to develop W-2 programs and provide maintenance service in behalf of Grace. Geac also produced evidence that Grace used improper means to acquire Geac's trade secrets by inducing Geac's licensees to divulge trade secrets under the false representation to them that the Hutto-VA agreement authorized Grace to act generally as a third party consultant; that on the basis of this false representation, Geac's licensees allowed Grace to service their copies of the Millennium program without Geac's knowledge or consent.

Grace disputes that Geac produces any evidence to support "a true trade secret claim." Grace argues that Geac did not make reasonable efforts to retain the trade secrecy of their customer lists and that there was no evidence of misappropriation. Geac admits that its customer lists were distributed to participants at its user conferences but contends that parties had to sign a confidentiality agreement. Because of the error of law and disputed issues of material facts, the entry of partial summary judgment was improper and will be vacated. The issue of misappropriation of trade secrets, therefore, will be remanded to the District Court for further proceedings consistent with this opinion.

IV.

GRACE'S CROSS-APPEAL

Grace and Ilutzi have cross-appealed raising numerous issues. We conclude that each issue has no merit and therefore we discuss each item only briefly.

First, Grace claims that the District Court erred in dismissing the breach of contract counterclaim "without articulating any factual basis for its decision." We could not disagree more with Grace's characterization of the District Court's decision. The court was quite clear when it stated that there is not "sufficient quantum of proof to establish that we have a contract." The contract claim was based on the "Hutto-VA" Agreement. As we have discussed above, the District Court found this agreement invalid and that it contained no blanket authority for Grace to serve all of Geac's customers without appropriate, individual, non-disclosure agreement. We see no error.

Even if there was a meeting of the minds, we conclude that the "Hutto-VA" Agreement is still not an enforceable contract because of lack of adequate consideration. Although Grace agreed not to disclose "proprietary or confidential information," there is no indication of what Geac promised in return or what Grace bargained for in return of its promise. Without any reference to the record for evidentiary support, Grace argues that Geac promised "that it would have no infringement claim against Grace if it complied with this agreement." However, the plain language of the agreement is silent as to any such promise.

For similar reasons, we reject Grace's promissory estoppel claim because it has failed to identify any clear or definite promise to which it reasonably relied upon. We do not reach the merits, however, because we conclude that Grace waived it by not asserting it before the District Court. United Parcel Serv., Inc. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local Union No. 430, 55 F.3d 138, 140 n.5 (3d Cir. 1995) ("It is the general rule that issues raised for the first time at the appellate level will not be reviewed.").

Second, Grace had pled a tortious interference counterclaim alleging that Geac's conduct damaged it economically with third parties. More specifically, as the Magistrate Judge also noted, the essence of the claim here is the alleged tortious conduct of Geac's General Counsel James Alberg and certain letters he sent to the licensees. Grace assigned two errors to the District Court in dismissing this claim. The District Court dismissed the

claim because Grace failed to produce sufficient evidence to prove that any third parties acted on a letter sent by

Alberg. This was not erroneous. FDIC v. Bathgate , 27 F.3d 850, 871-72 (3d Cir. 1994) ("Under New Jersey law[one of] the five elements of a claim of tortious interference with a prospective or existing economic relationship [is] the reasonable probability that plaintiff would have received the anticipated economic benefit in the absence of interference.") (citations omitted). The basis of the District Court's dismissal was therefore the failure by Grace to produce sufficient evidence as to causation. Thus, Grace's complaint on not having been provided an opportunity to prove damages because the case was bifurcated is irrelevant. There is no need to address whether the tortious interference claim fails to satisfy the other elements of the cause of action.

Grace's other claim of error on the tortious interference claim is equally unconvincing. It complains that the Magistrate Judge erroneously limited discovery, prejudicing its ability to present this claim. Were we to reach the merits, we would not agree. Grace was provided access to Geac's documents of seventy of its licensees to whom Grace provided maintenance services. If Grace needed to contact other licensees to determine what effect letters sent by Alberg had on their decision making process, they could have turned to their own customer list. We see no error or prejudice warranting reversal. Moreover, we conclude that Grace waived the right to complain of the Magistrate Judge's alleged limited discovery order by failing to appeal it to the District Court. United Steelworkers of Am., AFL-CIO v. New Jersey Zinc Co., 828 F.2d 1001, 1006 (3d Cir. 1987) ("Congress intended that review of a magistrate's decision on a nondispositive pretrial matter must, initially, be had in the district court.") (quoting Siers v. Morrash, 700 F.2d 113, 114-15 (3d Cir. 1983); id. at 1008 ("[T]his court has consistently held that it will not, absent extraordinary circumstances, address on appeal issues not originally presented to the district court.").

Third, Ilutzi argues that the District Court's refusal to allow the jury to consider evidence of copyright misuse as a defense to any possible infringing activity was erroneous.

Ilutzi contends that Geac "sought to use its copyright to take and retain control over an entirely different market than that covered by copyright (in seeking) to control services and maintenance with respect to its software." Because the District Court found that this defense suffered from the same infirmity as the contract and tortious interference counterclaim, it struck the defense. This Court has not yet addressed the legal viability of the copyright misuse as a defense. We reserve consideration of this issue for another case. Even if we were to adopt copyright misuse as a defense as laid out in Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 972-77 (4th Cir. 1990), we agree with the District Court that the record is simply devoid of any evidence of misuse by Geac. As we have discussed at length in our discussion of the motion denying judgment as

a matter of law, Geac's Licensing Agreements with its clients specifically allow for third party maintenance provided the third party signs non-disclosure agreements acceptable to Geac and complies with other conditions contained therein.

Finally, both Grace and Ilutzi vehemently contend that the District Court abused its discretion in denying them, as the prevailing party in the copyright infringement action, attorney's fees pursuant to 17 U.S.C. S 505. In light of our disposition of this appeal and cross-appeal, we conclude that the issue is moot and do not address it.

Lastly, Ilutzi submits that Geac has abandoned claims against him because he is not named or listed in Geac's opening brief. We find this argument to border on the frivolous. In no uncertain terms, Geac noted in its opening brief that references to Grace include all the defendants, appellees, and cross-appellants. Furthermore, Geac's notice of appeal was from the June 6, 2000, judgment of no action entered in favor of both Grace and Ilutzi. Thus, both parties are properly before this Court as appellees.

V.

CONCLUSION

In summary, we hold that the District Court erred in denying Geac's motion for judgment as a matter of law. The

District Court's judgment rejecting Geac's claim for misappropriation of trade secrets will be vacated. The District Court's order dismissing defendant's counterclaims will be affirmed. In light of our decision on the motion for judgment as a matter of law, there is no need to reach Geac's motion for new trial and the alleged evidentiary and jury instruction errors. Grace's motion for attorney's fees will be denied as moot. The case will be remanded to the District Court with direction to enter an order vacating the judgments entered in favor of the defendants and for such further proceedings as are consistent with this opinion. Costs taxed against the defendants-appellees.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit